EXHIBIT 3

Westlaw.

Not Reported in A.2d
2005 WL 89403 (Del.Ch.)
(Cite as: 2005 WL 89403 (Del.Ch.))

Page 1

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.
DEMARIE
v.
NEFF
No. Civ.A.2077-S.

Submitted Dec. 13, 2004.
Jan. 12, 2005.

Dear Counsel:

NOBLE, Vice Chancellor.

*1 Plaintiff Peter P. DeMarie, II ("DeMarie") seeks
specific performance of a contract to purchase
Defendant Joan S. Neff's ("Neff") interest in a parcel
of land in Bethany Beach, Delaware. This post-trial
letter opinion conveys the Court's findings of fact and
conclusions of law.

I.

As of spring 1998, Neff and her mother, Regina C.
Paroni, each owned a one-half interest in a parcel of
undeveloped land, claimed to be two acres in area, in
Bethany Beach (the "Parcel"). [FN1] The Christian
Church (the "Church") owned lands adjacent to the
Parcel (the "Church Lands"). The Parcel and the
Church Lands were subject to a boundary line
dispute. Approximately one-half of the Parcel was
within the record boundaries of the Church Lands,
but Neff and her mother claimed title to the area of
overlap by adverse possession.

> FN1. Mrs. Paroni has since passed away.
> Her one-half interest was devised in equal
> shares to Neff and her sister, Adele Paroni.
> Thus, Neff holds a three-quarter interest in
> the Parcel.

DeMarie, a licensed real estate broker and real estate
developer, had previously assisted Neff in the sale of
various real estate holdings. In late 1997, Neff
decided to sell the Parcel and again called on
DeMarie. She informed DeMarie that the Parcel's
sale price would be $400,000. Eventually, instead of
facilitating the sale of the Parcel, DeMarie proposed

to purchase the Parcel himself. DeMarie also had
been discussing with the Church whether it would
agree to sell the Church Lands to him. If DeMarie
could acquire both parcels, it would solve the
boundary line dispute and it would create the last
large parcel (approximately 5 acres) for development
in Bethany Beach.

On June 27, 1998, DeMarie, as buyer, and Neff, as
seller, for herself and purportedly for her mother,
executed an agreement of sale (the "Agreement")
[FN2] for the Parcel. The Agreement was executed at
the conclusion of a meeting attended by DeMarie,
Neff, and her son at Neff's home. DeMarie had
prepared the Agreement on a preprinted realtor's
contract form. Neff inserted her name, her mother's
name, and their addresses. She also wrote in
paragraph 29, as an addendum, the following: "Seller
+/or Purchaser to cooperate with Seller on tax
manuevers (sic)." Otherwise, the draft was prepared
(or the standard form was filled out) exclusively by
DeMarie. [FN3] The Agreement established a
purchase price of $400,000 and required a "deposit
upon signing the contact" of $1,000. No escrow agent
for holding the deposit was designated. No settlement
date was prescribed; instead, settlement was to occur
"30 days after all contingencies [were] met."

> FN2. PX 1.
>
> FN3. In one of many factual disputes,
> DeMarie testified that the Agreement had
> been submitted to Neff's attorney before
> signing. Neff denies that.

The following conditions were all handwritten by
DeMarie in paragraph 28 of the Agreement:
  Sale Contingent on Church lands next door being
  sold to Peter DeMarie.
  Sale Contingent on Dispute of Land between
  parties being settled.
  Sale contingent on Rezoning of land to B-1.
  Sale contingent on Wet-Land (sic) Delenation (sic).
  No commission Due on this contract.

DeMarie had brought only the original of the
Agreement to the meeting with Neff; he took the
signed original with him when he left and never
provided a copy of it to Neff. He did forward a copy
of it to the law firm representing Neff; perhaps
infelicitously, that law firm also represented
DeMarie.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2005 WL 89403 (Del.Ch.)
(Cite as: 2005 WL 89403 (Del.Ch.))

Page 2

*2 The Agreement required DeMarie to pay a $1,000 deposit. In his Verified Complaint for Declaratory Judgment and Specific Performance (the "Complaint"), DeMarie averred: "Concurrent with signing the contract, Buyer tendered to Sellers the sum of One Thousand Dollars ($1,000.00) toward the purchase price, but Sellers refused the funds at that time for tax planning reasons. See Exhibit '2." ' [FN4] Exhibit 2 to the Complaint was DeMarie's check number 1845 (the "Check"). [FN5] That paragraph fairly alleges that DeMarie tendered the Check to Neff on signing of the Agreement. That is not what happened.

FN4. Compl. ¶ 8.

FN5. PX 2.

At his deposition, DeMarie testified as follows:
Q: [By Mr. Griffin:] What does the document before you [the Agreement] require, as far as payment of a deposit?
A: [DeMarie:] $1,000.
Q: When does it require that to be paid?
A: At the signing of this contract.
Q: And you brought with you a check for $1,000, payable to Joan Neff?
A: Yes.
Q: And that is the original check [referring to the Check]?
A: Yes.
Q: On what date did you actually write that check?
A: June 27, 1998. [FN6]

FN6. DX 5 at 7-8. The deposition was taken on February 23, 2001, shortly after this action was filed on December 5, 2000, and, as will be seen, shortly after he wrote the Check.

DeMarie's deposition testimony that he brought with him to the meeting at which the Agreement was signed a check in the amount of $1,000, payable to Joan Neff, and his testimony that he "actually" wrote that check on June 27, 1998, were false.

At trial, DeMarie conceded that he did not write the Check on June 27, 1998, [FN7] but he claimed that he did not know when he had written it. [FN8]

FN7. Trial Transcript ("Tr.") 23, 57-58.

FN8. Tr. 23, 68-69. DeMarie professed to not even knowing the year in which he

wrote the Check. Tr. 59.

The Check is dated June 27, 1998. DeMarie's bank statement for the account on which the Check was written reveals that, in June 1998, checks numbered in the range of 1620 to 1637 were negotiated. [FN9] His December 2000 bank statement reflects the processing of checks numbered between 1839 and 1844. [FN10] Thus, it is more probable than not that DeMarie wrote the Check (number 1845) in December (or possibly late November) 2000 but dated it as of June 27, 1998. [FN11]

FN9. DX 4 (bank statement for period 6/11/98-7/13/98).

FN10. Id. (bank statement for period 11/13/00-12/13/00).

FN11. It is conceivable, perhaps, that he randomly pulled check 1845 from one of the "red boxes," which contained his blank checks. However, a review of his bank statements demonstrates that his checks were generally written in numerical order.

DeMarie sought to justify his post-dating of the Check on his "keeping a record" of his efforts to pay the deposit. [FN12] Post-dating a check by as much as 30 months is, at best, a strange way of memorializing events.

FN12. When asked at trial why he wrote the Check, DeMarie responded: "For the record. To keep a record that I had a check and I put it in the file promptly." Tr. 71.

The story of the Check is important because Neff testified that DeMarie neither paid to her nor offered to pay to her the $1,000 deposit. DeMarie conceded at trial that he did not pay the deposit to Neff on signing of the Agreement in June 1998. He testified that he had his checkbook with him and that he offered to pay Neff but that she refused for "tax reasons." [FN13] He also testified that he offered to pay the deposit on at least two other occasions but that, again, Neff refused to accept the deposit. [FN14] DeMarie asserted that, following one unsuccessful attempt to give the deposit to Neff, they agreed that "friendship" could be the equivalent of the deposit. Neff denies both the post-signing efforts by DeMarie to pay the deposit and the discussion regarding "friendship" as a substitute for a cash deposit.

FN13. Tr. 73.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2005 WL 89403 (Del.Ch.)
(Cite as: 2005 WL 89403 (Del.Ch.))

Page 3

FN14. Tr. 23-24.

*3 The Court credits Neff's testimony that no deposit was ever paid or offered to her. It is perplexing that DeMarie did not pay the required $1,000 deposit because it is a trifling sum to support a $400,000 real estate contract. [FN15] DeMarie, however, simply has no credibility with respect to the payment of the deposit. His inability or unwillingness to provide the truth on separate occasions regarding the Check calls into question any testimony that he may have given about the deposit. [FN16]

> FN15. Although the account on which the Check was written frequently had a balance less than $1,000, DeMarie had overdraft protection and, thus, had the wherewithal to pay the deposit.

> FN16. This, of course, implicates the maxim *"falsus in uno, falsus in omnibus."* See *Filiaggi v. Garrett,* 1995 WL 945555, at *4 (Del.Super.Aug. 11, 1995)* ("[I]f the jurors find a witness knowingly gives false testimony, they might, as a factual matter, naturally be inclined to look with suspicion on all the testimony of that person."). The Court's assessment of DeMarie's credibility is, of course, not based simply on some maxim. Instead, it is the product of listening to, and observing, both DeMarie and Neff as trial witnesses.

Neff, as will be discussed, acted as if she were a party to a binding agreement for the sale of the Parcel. She never asked DeMarie about the deposit because she assumed that DeMarie had taken care of the deposit. Her reliance, however misplaced, was reasonable in light of her previous dealings with DeMarie and his status as a licensed real estate broker. It was not until late winter of 1999-2000 when she received a copy of the Agreement from the law firm that represented her that she realized that no deposit had been paid.

Both DeMarie and Neff understood when they executed the Agreement that settlement might not occur for some extended period of time. The transaction was conditioned on DeMarie's acquisition of the Church Lands. That effort depended not only upon securing the necessary approval within the Church bureaucracy but also on resolution of questions involving a restriction binding the Church Lands that limited use of that parcel to religious purposes. Neff met at least once with DeMarie and representatives of the Church to address these concerns.

DeMarie had pursued acquisition of the Church Lands even before entering into an agreement with Neff. [FN17] In April 1998, he submitted an offer. [FN18] In January 1999, the Church informed him that it could not at that time consider his offer because of title questions, presumably involving the restriction regarding religious use. [FN19] DeMarie submitted another offer to purchase the Church Lands in August 1999. [FN20] Other options, including a long-term lease of the Church Lands, were considered. [FN21] However, in February 2000, the Church rejected his offer. [FN22]

> FN17. PX 3; PX 4.

> FN18. PX 5.

> FN19. PX 6.

> FN20. PX 8.

> FN21. PX 9.

> FN22. PX 11.

In addition to pursuing acquisition of the Church Lands, DeMarie took other steps toward settlement. He initiated a wetlands delineation study. He had performed some very preliminary site planning work. [FN23] He directed, after consulting with Neff, a partial clearing of the Parcel at a cost of $2,390. [FN24] These efforts, in the context of a transaction of the size of the one anticipated by the Agreement, were minimal.

> FN23. PX 12. This work consisted of a rudimentary site plan and was submitted to DeMarie on March 1, 2000.

> FN24. PX 10.

On March 17, 2000, Neff sent DeMarie a letter disavowing any contractual obligations to him regarding the Parcel. [FN25] She cited a host of failures, most notably the failure to pay the $1,000 deposit. On March 28, 2000, DeMarie responded with a letter offering to remove all contingencies except for the obligation to provide clear title. [FN26] On April 7, 2000, Neff sent DeMarie a check, which he returned to her, to reimburse him for the expenses he had incurred in clearing a portion of the Parcel.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN27]

> FN25. PX 13.
>
> FN26. PX 17.
>
> FN27. PX 14; PX 15.

**\*4** On December 5, 2000, DeMarie filed this action seeking specific performance of the Agreement. [FN28] He did not seek an award of damages.

> FN28. This action was brought against Neff and her sister. Summary judgment was entered in favor of the sister because Neff lacked the authority to bind her mother when she signed the Agreement. Thus, only Neff's three-quarter interest in the Parcel is at issue in this litigation.

On November 17, 2000, Neff and her sister agreed to sell the Parcel to the Town of Bethany Beach (the "Town") for $475,000. [FN29] The Town had in the interim agreed to acquire the Church Lands. On August 11, 2004, the Town agreed to purchase the Parcel from Neff and her sister for $690,400, [FN30] almost $300,000 more than the purchase price which DeMarie had agreed to pay under the Agreement. [FN31]

> FN29. DX 2.
>
> FN30. DX 3.
>
> FN31. When Neff sent the letter purporting to terminate the Agreement, she was aware that the Church had rejected DeMarie's efforts to purchase the Church Lands. What is not clear is whether she knew that the Town was going to purchase the Church Lands and would be interested in acquiring the Parcel. It is, however, reasonable to infer, and the Court, perhaps unnecessarily, does infer, that Neff's letter of March 17, 2000, was motivated by an expectation of a higher offer from the Town and perhaps one without the aggravation of having to address the boundary overlap problem.

## II.

DeMarie seeks specific performance of a real estate purchase agreement. When the remedy at law is not adequate, this Court has jurisdiction to enforce specifically a contract for the sale of land . [FN32] Specific performance is a remedy that is particularly suitable for land given its unique characteristics. [FN33] "To grant specific performance, there must be proof of a valid contract to purchase real property and proof that plaintiff was ready, willing and able to perform his contractual obligations. In addition, the Court must determine whether the 'balance of equities' tips in favor of specific performance." [FN34] The burden of proving that a valid contract existed--and its terms--is on the party seeking to enforce the contract, as well as the burden to convince this Court that specific performance is equitably warranted. [FN35]

> FN32. *See, e.g., Old Time Petroleum Co. v. Turcol,* 153 A. 562 (Del. Ch.1931).
>
> FN33. *See Robert J. Smith Companies, Inc. v. Barke,* 1997 WL 294442, at \*2 (Del. Ch. May 28, 1997) (citations omitted) ("[L]and has been deemed to be a unique form of property and a proper subject of specific performance since the time of the English Chancellors.").
>
> FN34. *Morabito v. Harris,* 2002 WL 550117, at \*2 (Del. Ch. Mar. 26, 2002) (citation omitted).
>
> FN35. *See Kowal v. Clark,* 2000 WL 739250, at \*3 (Del. Ch. June 2, 2000) ("[T]he buyers have 'the burden of proving the existence and terms of an enforceable contract by clear and convincing evidence.' Moreover, the remedy of specific performance of contracts for the sale of land is a matter squarely within this Court's discretion.") (citation omitted).

First on the list of issues raised in this action are questions regarding the $1,000 deposit. What effect does the failure to fulfill one's obligation to pay a deposit have? What if the deposit could be fairly characterized as *de minimis* in relation to the purchase price? What if the party who was to receive the deposit continued to act as if the contract was in full force (*i.e.,* the party who was to receive the deposit acted as if her nonreceipt of the deposit did not make a difference)? Substantial failure to live up to the material terms of a valid contract nullifies that contract. " '[A] party may terminate or rescind a contract because of substantial nonperformance or breach by the other party.' Not all breaches will authorize the other party to abandon or refuse further performance. To justify termination, 'it is necessary that the failure of performance on the part of the

Not Reported in A.2d
2005 WL 89403 (Del.Ch.)
(Cite as: 2005 WL 89403 (Del.Ch.))

other go to the substance of the contract." ' [FN36] "[M]odern courts, and the Restatement (Second) of Contracts, recognize that something more than mere default is ordinarily necessary to excuse the other party's performance in the typical situation, subscribing to the general rule that where the performance of one party is due before that of the other party, such as when the former party's performance requires a period of time, an uncured failure of performance by the former can suspend or discharge the latter's duty of performance only if the failure is *material or substantial."* [FN37] Thus, although a material breach excuses performance of a contract, a nonmaterial--or *de minimis*--breach will not allow the non-breaching party to avoid its obligations under the contract.

> FN36. *Saienni v. G & C Capital Group, Inc.,* 1997 WL 363919, at *3 (Del.Super. May 1, 1997) (citations omitted); *see also Bryan v.. Moore,* 2004 WL 2271614 (Del. Ch. Sept. 28, 2004) (discussing the argument that "[i]n response, the sellers concede that the buyer was ready, willing and able to perform on March 27, 2002, but argue that time was of the essence in these contracts, and the buyer's failure to settle on February 28, 2002 was a *material breach that caused the contracts to be null and void"* ) (emphasis added); *Dickinson Medical Group v. Foote,* 1989 Del.Super. LEXIS 156 (Mar. 23, 1989) (holding that medical group's failure to compensate a physician for services as delineated in her contract was a material breach, which excused her continued employment, where a physician had an employment contract for a defined term).

> FN37. 14 WILLISTON ON CONTRACTS 43:15 (4th ed.2004) (footnotes omitted) (emphasis added); *see also Jefferson Chem. Co. v. Mobay Chem. Co.,* 267 A.2d 635, 637 (Del. Ch.1970) ("[Equity] will disregard a forfeiture occasioned by failure to comply with the very letter of an agreement when it has been substantially performed."); *Safe Harbor Fishing Club v. Safe Harbor Realty Co.,* 107 A.2d 635, 638 (Del. Ch.1953) (noting that this Court will not award the remedy of specific performance to a party "who fails to show either substantial performance on his part or that he offered to discharge the duty imposed upon him by his contract").

**\*5** The question still remains: even if a buyer forfeits his rights by not performing under the contract, is the contract void or merely voidable by the seller? Williston provides the answer:

> Where there has been a material failure of performance by one party to a contract, so that a condition precedent to the duty of the other party's performance has not occurred, the latter party has the choice to continue to perform under the contract or to cease to perform, and conduct indicating an intention to continue the contract in effect will constitute a conclusive election, in effect waiving the right to assert that the breach discharged any obligation to perform. In other words, the general rule that one party's uncured, material failure of performance will suspend or discharge the other party's duty to perform does not apply where the latter party, with knowledge of the facts, either performs or indicates a willingness to do so, despite the breach, or insists that the defaulting party continue to render future performance. [FN38]

> FN38. 14 WILLISTON ON CONTRACTS at 43:15 (footnotes omitted); *see also SLMSoft.Com, Inc. v. Cross Country Bank,* 2003 WL 1769770, at *11 (Del.Super.Apr. 2, 2003) ("[T]his Court holds that an obligor who (1) asserts a material breach that arises from an anti-assignment provision that allegedly renders the underlying contract voidable, and (2) fails to void that contract while continuing to perform for assignees, and (3) then admits to the ongoing validity of such contract as against subsequent assignees, is estopped from arguing voidability."); *Berdel, Inc. v. Berman Real Estate Mgmt., Inc.,* 1997 WL 793088, at *9 (Del. Ch. Dec. 15, 1997) ("Absent evidence of an alleged oral agreement, there is no factual basis for the Court to find that the six documents signed by the Bermans are void or voidable on the grounds of fraud, misrepresentation or breach of contract or of fiduciary duty.").

Thus, as an exception to the general rule, the nonbreaching party may not, on the one hand, preserve or accept the benefits of a contract, and on the other hand, assert that contract is void and unenforceable. [FN39]

> FN39. *See SLMSoft.Com,* 2003 WL 1769770, at *11.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                Page 6
2005 WL 89403 (Del.Ch.)
(Cite as: 2005 WL 89403 (Del.Ch.))

III.

With these principles in mind, it is necessary to return to the Agreement in an effort to determine the role of the deposit. The payment terms of the Agreement unambiguously specify that the $1,000 deposit was to be paid on signing. DeMarie breached that obligation; he did not pay the deposit. Paragraph 11 of the Agreement sets forth the parties' understanding as to the consequences of a default: "Should [DeMarie] fail to make payments ... as specified above ... or fail to perform any of the terms or conditions of this Contract, then [Neff] shall have the right and option to declare this Contract null and void...." The $1,000 deposit was one of the "payments ... specified above." Accordingly, DeMarie's failure to pay the deposit entitled Neff "to declare [the Agreement] null and void," which she did through her letter of March 17, 2000. That, however, does not end the Court's inquiry.

First, Neff could have agreed that DeMarie need not pay the deposit. The Court, however, has found as a matter of fact that she made no such agreement. [FN40] Second, if Neff knew that the deposit had not been paid but continued acted as if the transaction were going forward, she might be estopped from invoking DeMarie's default as the basis for exiting the Agreement. Although Neff continued to act as if the Agreement remained in effect, the Court has found that she did not know that no deposit had been made until shortly before she sent her termination letter and that her reliance upon DeMarie, in the circumstances, was reasonable. [FN41]

> FN40. Thus, the Court does not address Neff's argument that any such agreement would have required a formal, written modification of the Agreement.

> FN41. Neff did not waive her right to the deposit. A "[w]aiver is the voluntary and intentional relinquishment of a known right." *Realty Growth Investors v. Council of Unit Owners,* 453 A.2d 450, 456 (Del.1982). Because she did not know that DeMarie had failed to pay the deposit, she did not waive the right to a deposit. *See also Norberg v. Security Storage Co. of Wash.,* 2000 WL 1375868, at *7 (Del. Ch. Sept. 19, 2000) ("For the doctrine of waiver to apply, the Court must be persuaded that the party intended to voluntarily relinquish a known right.").

Finally, there is the question of whether the failure to pay a $1,000 deposit a $400,000 purchase price is such a small divergence from the Agreement's requirements as to preclude reliance upon it for avoiding the Agreement. A deposit to "bind" a real estate agreement has both economic and symbolic importance. The parties expressly agreed that failure to make any required payment--and the deposit was one of the required payments--would be grounds for termination. Although a relatively small amount, $1,000 is not a nominal sum. In short, the Court is reluctant, without any principled basis, to conclude that a $1,000 deposit simply is of no moment. Indeed, the best evidence of the relative importance of the deposit may be DeMarie's own conduct in post-dating the Check and his testimony about it. Accordingly, DeMarie's failure to make timely payment of the deposit entitles Neff to avoid the Agreement and Neff's subsequent conduct does not deprive her of the opportunity to take this position. [FN42]

> FN42. It is not clear whether DeMarie has also sought a declaratory judgment with respect to his rights under the Agreement, separate and apart from a request for specific performance. To the extent that there is such a claim, the Court concludes that Neff's letter of March 17, 2000, effectively terminated whatever remaining rights DeMarie may have had under the Agreement.

*6 In conclusion, DeMarie's failure to comply with the terms of the Agreement precludes the award of specific performance. [FN43]

> FN43. Thus, it is unnecessary to consider the numerous other arguments raised by Neff as to why DeMarie is not entitled to the relief which he has sought.

IV.

For the foregoing reasons, judgment is entered in favor of Neff and against DeMarie with the consequence that all relief sought by DeMarie is denied. Costs are awarded to Neff.

IT IS SO ORDERED.

2005 WL 89403 (Del.Ch.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 4

Westlaw.

Not Reported in A.2d
1986 WL 4494 (Del.Ch.)
(Cite as: 1986 WL 4494 (Del.Ch.))

Page 1

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.
Dorothy SCOTT
v.
CITY OF HARRINGTON, et al.

Submitted: Feb. 28, 1986.
Decided April 14, 1986.
Michael K. Tighe, Howard M. Berg & Associates, P.A., Wilmington, Delaware.

John K. Welch, Deputy Attorney General, Department of Transportation, Dover, Delaware.

William J. Walls, Jr., Gerald I.H. Street, P.A., Dover, Delaware.

JACK B. JACOBS, Vice-Chancellor.

*1 The plaintiff, Dorothy Scott, brought this action on August 24, 1984 seeking injunctive and declaratory relief against the defendants, the City of Harrington and the Department of Transportation of the State of Delaware. The plaintiff seeks a determination that the defendants' actions constitute a *de facto* taking of her property entitling her to an award in inverse condemnation. On November 27, 1985, the plaintiff filed a Motion for Leave to File an Amended Complaint to add a claim of continuing trespass. The defendants oppose the plaintiff's motion to amend and have moved for summary judgment on the plaintiff's inverse condemnation claim. This is the decision of the Court on both motions.

I.

Since 1948 the plaintiff has lived on East Street in Harrington, Delaware in a single-family dwelling. In September 1978, the Department of Transportation contracted with Warren Brothers, a general contractor, to widen and resurface the plaintiff's street. Warren Brothers began the project on November 6, 1978 and completed its work on January 17, 1980. During the period of reconstruction, the plaintiff remained in her home.

The plaintiff alleges that during the construction Warren Brothers covered a drain which had been placed in front of her home to direct the flow of water away from her property through a drainage ditch. She contends that after the project was finished she began to experience severe flooding, although she suffered no drainage problems prior to the construction. She also contends that the flooding has continued until the present.

The defendant denies those allegations. It further disputes plaintiff's claim that she attempted to contact the Department of Transportation and representatives of the City to seek help prior to bringing this action.

The plaintiff originally brought this action seeking inverse condemnation, alleging that the defendant's actions amounted to a *de facto* taking of her property for which she was entitled to just compensation. The defendants moved for summary judgment alleging, *inter alia,* that this Court lacks subject matter jurisdiction. In response, the plaintiff moved to amend her complaint to add a claim of continuing trespass. The defendants oppose this motion.

Generally, the Court will freely grant leave to amend the pleadings, even after the pleadings are closed, except when there is evidence of undue prejudice or undue delay. *Foman v. Davis,* 371 U.S. 178 (1962); *Tomczak and Wechsler v. Morton Thiokol,* C.A. No. 7831, Hartnett, V.C. (September 26, 1985). However, an amendment will not be allowed where its allowance would run afoul of the doctrine of election of remedies.

Under the doctrine of election of remedies, a party who has two or more inconsistent remedies available, and elects to pursue one of them to the exclusion of the others, may not later pursue other inconsistent remedies. *Sannini v. Casscells,* Del.Supr., 401 A.2d 927; *Taylor v. Robertson Petroleum Co.,* Kan.Supr., 137 P.2d 150 (1943); 25 Am.Jur.2d *Election of Remedies* § § 14-17 (1964).

*2 A party is said to have elected a remedy when he makes any decisive act, "with knowledge of his rights and of the facts, indicating an intent to pursue one remedy rather than the other." *Stoltz Realty Co. v. Raphael,* Del.Supr., 458 A.2d 21, 23 (quoting 28 C.J.S. *Election of Remedies* § 11 at 1077 (1941)). One decisive act that constitutes such an election is the prosecution of a claim to a final judgment or decree. *Id.* The commencement of an action,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
1986 WL 4494 (Del.Ch.)
**(Cite as: 1986 WL 4494 (Del.Ch.))**

seeking one of the inconsistent remedies, has also been regarded as a decisive act constituting an election. _Taylor v. Robertson Petroleum Co.,_ 137 P.2d 150, 155 (citing 18 Am.Jur. _Election of Remedies_ § 18); _See also,_ 25 Am.Jur.2d Election of Remedies § 16 (1964).

Here, the plaintiff had at least two remedies available when she made her election: the legal remedy of damages for inverse condemnation and the equitable remedy of an injunction for a continuing trespass. Those two remedies are inconsistent. 25 Am.Jur.2d _Election of Remedies_ §§ 11, 26. Inverse condemnation affords a remedy to a person whose property has been taken for public use without formal condemnation proceedings. 27 Am.Jur.2d _Eminent Domain_ § 478. The party must allege that the municipality or its representative has deprived him of substantially all beneficial use of his property, thereby entitling him to recover the full value of the property taken. Powell, _The Law of Real Property,_ v. 6, ¶ 866.

By asserting a claim for injunctive relief for continuing trespass on the other hand, the party seeking an injunction necessarily seeks to have future interferences restrained. That remedy, therefore, is necessarily inconsistent with the remedy of damages for inverse condemnation, which assumes that the property for which compensation is sought has been permanently taken. An action to enjoin a continuing trespass seeks to prevent such a permanent taking by halting the act (in this case, flooding) that is claimed to constitute the taking. [FN*]

Having elected to pursue the remedy of inverse condemnation, the plaintiff is foreclosed from pursuing the inconsistent remedy of an injunction for continuing trespass. Accordingly, the plaintiff's motion to amend must be denied.

The defendants have also moved for summary judgment on the plaintiff's inverse condemnation claim on the ground that this Court lacks subject matter jurisdiction to hear such a claim. The defendants argue that 10 _Del.C._ § 6102, which grants exclusive jurisdiction to Superior Court over condemnation claims, also extends to inverse condemnation claims.

The defendants' position is supported by _Delaware Power & Light Co. v. Terry,_ Del.Ch., 194 A.2d 553 (1963). There Chancellor Seitz held that the Superior Court had exclusive jurisdiction over inverse condemnation claims pursuant to 10 _Del.C._ §

6102. _Id._ at 558. No case has been cited or found which holds to the contrary. The defendants' motion for summary judgment for lack of subject matter jurisdiction must therefore be granted.

**\*3** The defendant goes on to argue, nonetheless, that this Court should deny plaintiff's motion to transfer this action to the Superior Court pursuant to 10 _Del.C._ § 1902. The defendant claims that a transfer would be prejudicial, since the action would proceed in the absence of an indispensable party, namely Warren Brothers.

The defendants' claim of prejudice is without merit. If there is a valid defense based on an alleged failure to join an indispensable party, it may competently be heard in the Superior Court. On the other hand, if this action were not transferred, the plaintiff would be left without any means to pursue her claims, since this Court has no jurisdiction to address them.

To summarize, the plaintiff's motion to amend her complaint is denied, the defendant's motion for summary judgment is granted; and this case is hereby transferred to the Superior Court pursuant to 10 _Del.C._ § 1902.

IT IS SO ORDERED.

> FN* In that vein, the plaintiff further seeks a writ of mandamus requiring the Department of Transportation to remedy the flooding by constructing drainage ditches.

1986 WL 4494 (Del.Ch.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 5

Westlaw.

Not Reported in A.2d
2003 WL 21481012 (Del.Super.)
(Cite as: 2003 WL 21481012 (Del.Super.))

Page 1

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of Delaware.
Goran FATOVIC, et al., Plaintiffs,
v.
CHRYSLER CORPORATION, Baker Chrysler-
Plymouth-Jeep-Eagle, Inc. and Chrysler
Financial Company, L.L.C., Defendants.
No. Civ.A. 00C08299 HLA.

Submitted Nov. 12, 2002.
Decided Feb. 28, 2003.

Upon Defendants' Motions for Summary Judgment
and Other Relief. Granted.

Darryl K. Fountain, Wilmington, Delaware, for
Plaintiffs.

Michael J. Carlson, Anderson, Coe & King,
Baltimore, for Defendants.

ORDER

ALFORD, J.

*1 On this 28th day of February 2003, upon
consideration of DaimlerChrysler Corporation, Baker
Chrysler-Plymouth-Jeep-Eagle, Inc. and Chrysler
Financial Company, L.L.C.'s ("Defendants") Motions
for Summary Judgment and Other Relief, Goran
Fatovic and Preciosa Fatovic's ("Plaintiffs")
Response, and the oral argument heard on November
12, 2002, it appears to the Court that:

FACTS

This is a claim under various warranty and fraud
theories against DaimlerChrysler Corporation, sued
as Chrysler Corporation, ("Chrysler"), Baker
Chrysler-Plymouth-Jeep Inc. ("Baker"), and Chrysler
Financial Corporation ("CFC") based on alleged
defects existing in a 1999 Jeep Wrangler Sport
("Jeep") purchased by Plaintiffs. On or about August
7, 1998, Chrysler sold the Jeep to Butler. Co-
defendant Baker subsequently obtained the Jeep from
Butler in a swap of vehicles. Plaintiffs purchased the
Jeep on or about May 26, 1999 from Baker. Plaintiffs
previously owned two Jeep products, which they had

purchased from Baker and went to Baker again
knowing that they wanted to buy another Jeep.
Plaintiffs do not remember anything about their
dealings with Baker other than generally having a
conversation with a Baker salesman and having taken
a Jeep for a test drive. Plaintiffs purchased the Jeep
for $21,935.00. Taxes and registration fees were
$649.00. Plaintiffs made a cash deposit of $10,100.00
and received a credit of $3,435.00 on the trade-in of
an old vehicle. Plaintiffs financed the balance owed
($9,049.00) with Co-Defendant CFC. The Jeep was
sold with a limited express warranty, which requires
Chrysler to bear the cost of repair of any defect in
material, workmanship or factory preparation.

Plaintiffs state that they returned the Jeep to Baker
the same day that they purchased it and told the
dealer that there was an air leak. This problem was
solved by simply re-fastening the removable top to
the Jeep properly. On June 14, 1999, Plaintiffs
brought the Jeep to Baker, complaining that there was
a water leak onto the right front floor. Baker
identified and repaired an open seam in the cowl (a
barrier between the engine compartment and the
passenger area of the Jeep). There was no charge to
the Plaintiffs. On June 21, 1999, Plaintiffs brought
the Jeep to Baker, complaining that water was
leaking under the heater duct. Baker identified the
problem as a leaking evaporator box and repaired it.
There was no charge to the Plaintiffs. On August 24,
1999, Plaintiffs brought the Jeep to Baker,
complaining that the Jeep still had a water leak.
Baker identified an apparent problem from the engine
area into the passenger compartment and fixed it.
There was no charge to the Plaintiffs. The last three
leaks were from different parts of the firewall, or the
area between the engine and the passenger
compartment. Subsequently, Plaintiffs discovered
that water had leaked into the back of the Jeep,
allegedly at the point where the removable hard top
roof meets the body of the Jeep.

*2 At some point prior to November 4, 1999,
Plaintiffs decided to rescind the sales contract and
surrendered the Jeep for voluntary repossession. On
November 15, 1999, the Jeep was picked up by
Hatfield Auto Auction ("Hatfield"). Hatfield cleaned
the Jeep for a charge of $70.00, but did no other work
on the Jeep. On November 23, 1999, Plaintiffs, by
their counsel, provided notice of Plaintiffs' rescission
of the sales contract. On December 2, 1999, the Jeep
was sold at Auction for $16,600.00 to the Loman

Not Reported in A.2d                                                                    Page 2
2003 WL 21481012 (Del.Super.)
(Cite as: 2003 WL 21481012 (Del.Super.))

Auto Group ("Loman"), a dealership in Parsippany, New Jersey. Loman did a used car check on the Jeep to determine any problems and found none. On January 15, 2000, Loman sold the Jeep to Margaret O'Sullivan for the pretax amount of $19,539.00. With taxes and other fees, the cost was $21,019.14.

Despite allegations made by Plaintiffs that the Jeep required major repairs, the facts reveal that the Jeep has been repurchased, without repair, and the current owner has experienced no leakage problems with the Jeep. Plaintiffs allege the following: Count 1) Breach of U.C.C. Express Warranty; Count II) Breach of U.C.C. Implied Warranty of Merchantability; Count III) Violation of the Magnuson-Moss Warranty Act-manufacturer's failure to fulfill its express warranty; Count IV) Violation of Magnuson-Moss Warranty Act--manufacturer's promise to repair most substantial nonconformities constitutes "deceptive warranties;" Count V) Violation of Magnuson-Moss Warranty Act-manufacturer's failure to comply with the implied warranty of merchantability; Count VI) Cancellation by Rejection; Count VII) Breach of Contract by failure to deliver and provide a vehicle fit for the ordinary purpose for which such goods are used; Count VIII) Breach of Contract-dealer's refusal or inability to effect proper repairs on said vehicle despite a multitude of service and repair visits; Count IX) Cancellation by Revocation of Acceptance; Count X) Rejection of Nonconforming Goods; Count XI) Vehicle sale has failed in its essential purpose, in violation of 6 Del. C. sec 2-719(2); Count XII) Violation of Title 6, Chapter 50 Automobile Warranties; Count XIII) Consumer Fraud; and Count IVX) Deceptive Trade Practices.

SUMMARY JUDGMENT

Summary judgment is appropriate when the moving party has shown that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. [FN1] In considering such a motion, the Court must evaluate the facts in the light most favorable to the non-moving party. [FN2] Summary judgment will not be granted under circumstances where the record reasonably indicates that a material fact is in dispute or if it seems desirable to inquire more thoroughly into the facts in order to clarify the application of law to the circumstances. [FN3]

FN1. *Moore v. Sizemore,* 405 A.2d 679 (Del.Supr.1979).

FN2. *Id.*

FN3. *Ebersole v. Lowengrub,* 180 A.2d 467 (Del.Supr.1962).

ANALYSIS

Defendants first argue that they are entitled to judgment on all counts because (i) Plaintiffs do not have an expert to establish the existence of a defect in the Jeep and (ii) Plaintiffs made an election of remedies that excludes the possibility of an action against Defendants. Defendants argue that there is no material dispute of fact and therefore Defendants are entitled to judgment as a matter of law. Defendants state that it is undisputed that Ms. O'Sullivan still owns the Jeep and has never had problems related to water leaks of any sort. The Jeep now has 22,887 miles and has always been parked outside, either in her driveway or the commuter parking lot at the local train station. Defendants' expert will opine that the leakage was the result of the removable top being improperly placed or secured on the Jeep rather than as the result of any defect in the Jeep. Defendants state that while a manufacturing defect can sometimes be demonstrated by circumstantial evidence alone, this is permissible only where the manufacturer's fault is the only reasonable inference to be made from such evidence . [FN4] Defendants contend that the circumstantial evidence does not rule out the possibility of other explanations for the problem, such as improper placement of the removable top.

FN4. *Joseph v. Jamesway Corporation,* 1997 Del.Super. LEXIS 264, C.A. No. 93c-12-182-JOH, (July 9, 1997)(citing *Ciociola v. Coca-Cola Bottling Co.,* 172 A.2d 252, 257 (Del.Supr.1961); *Reybold Group, Inc. v. Chemprobe Technologies, Inc.,* 721 A.2d 1267, 1270 (Del.Supr.1988)(summary judgment appropriate where circumstantial evidence did not negate other possible causes).

*3 Plaintiffs argue that the fact that they do not have an expert does not bar their claims. The Delaware Supreme Court has held that some breach of warranty claims do not require expert testimony. [FN5] If the matter in issue is one within the common knowledge of laymen, introduction of expert testimony is not required. [FN6] However, the Superior Court's granting of Defendant's Motion for Summary Judgment in *Reybold* was affirmed by the Supreme Court which held that the Plaintiff could not maintain an action for breach of implied warranty of merchantability in the absence of expert testimony or circumstantial evidence that the product was

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                         Page 3
2003 WL 21481012 (Del.Super.)
(Cite as: 2003 WL 21481012 (Del.Super.))

defective. [FN7] Plaintiffs attempt to distinguish *Reybold* stating that it is a personal injury case involving an automobile accident. However, Plaintiffs misstate the case. *Reybold* involves a possible building leak, subsequent repair of the brick work and resulting noxious odor from a water repellant product which was used. [FN8] The Plaintiff suffered a disruption of business and out of pocket expenses as the company was forced to relocate, due to health concerns, for over two months while the odor dissipated. [FN9] The Plaintiff in *Reybold,* failed to establish a *prima facie* case through circumstantial evidence of a defect. [FN10] The Court emphasized that for circumstantial evidence to support a *prima facie* case that there was a breach of implied warranty of merchantability, then Plaintiff's evidence must, "tend to negate other reasonable causes of the injury sustained or there must be expert opinion that the product was defective." [FN11]

> FN5. *Reybold Group, Inc., v. Chemprobe Technologies, Inc.,* 721 A . 2d 1267, 1269 (Del.Supr.1998).
>
> FN6. *Id.*
>
> FN7. *Id.*
>
> FN8. 721 A.2d at 1268.
>
> FN9. *Id.*
>
> FN10. *Id.* at 1270.
>
> FN11. *Reybold Group, Inc., v. Chemprobe Technologies, Inc.,* 721 A.2d 1267, 1270 (Del.Supr.1998)(quoting *American Family Mutual Ins. Co. v. Sears, Roebuck & Co.,* 998 F.Supp. 1162, 1164 (D.Kan.1998).

In the instant case, Plaintiffs have presented no evidence negating other reasonable causes, such as misplacement of the removable top. Plaintiffs argue that they owned two other Jeeps and therefore know how to properly place the top and that this circumstantial evidence rules out the Defendants' proposed explanation for the leak. However, during his deposition, Mr. Fatovich stated that he had never taken the roof off of the previous Jeeps. Also, the Plaintiffs initial complaint regarding an air leak, was easily remedied when the top was simply re-fastened at the dealership. Plaintiffs return to the dealership for the "repair" of this air leak indicates a lack of knowledge by the Plaintiffs on how to properly place

the Jeep top. Furthermore, the present owner has never had a leak problem, despite the fact that the Jeep was not repaired since the voluntary repossession. Here, as Defendants argue, Plaintiffs have failed to establish an essential element of its cause of action for a breach of implied warranty of merchantability through the use of either circumstantial evidence or expert testimony. A manufacturing defect in the Jeep has not been successfully established through the circumstantial evidence presented by Plaintiffs, and no expert has been provided.

Additionally, as Chrysler points out, Plaintiffs rescinded their purchase contract with Baker and did so prior to notifying Chrysler. Thus, Plaintiffs made an election of remedies and may not pursue other remedies against Chrysler that are inconsistent with this choice. The Supreme Court has stated that the, "doctrine of election of remedies is based on 'any decisive act of a party, with knowledge of his rights and of the facts, indicating an intent to pursue one remedy rather than the other." ' [FN12] This doctrine can be used to bar claims against other parties, [FN13] or additional claims against the same party. [FN14] In the instant case, Plaintiffs made a decisive act by rescinding the purchase contract and thus, are barred from pursuing other claims based on their ownership of the Jeep or their rights under the rescinded purchase contract. [FN15] Plaintiffs argue that an election of remedies is not required under the UCC and the Lemon Law in Delaware as the remedies are cumulative. However, Plaintiffs have not established the existence of a defect in order to enable Plaintiffs recourse under these statutes.

> FN12. *Stoltz Realty Co. v. Raphael,* 458 A.2d 21, 23 (1983) (citation omitted).
>
> FN13. *Id.*
>
> FN14. *Simmons v. Brooks,* 66 A.2d 519 (D.C.1949).
>
> FN15. *Id.*

**\*4** With regard to the express warranty claims (Count I) Chrysler and CFC had no contact with the Plaintiffs at or before the purchase of the Jeep, and thus no express warranties were provided other than the written, limited warranty provided with the Jeep. Defendants further separate arguments are discussed below.

*Defendant Chrysler's Arguments*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2003 WL 21481012 (Del.Super.)
(Cite as: 2003 WL 21481012 (Del.Super.))

Page 4

With regard to the Magnuson-Moss Act claims (Counts III-V) Chrysler argues that 1) Plaintiffs failed to use Chrysler's dispute resolution system and, thus, have no right to pursue an action under the Act; 2) There is no private cause of action for deceptive warranties under the Act; and 3) Chrysler did not violate its express warranty or the implied warranty of merchantability and, thus, did not violate the Act in any event. Plaintiff argues that there is not a qualifying arbitration mechanism for the dispute resolution under Delaware Law. The Court finds that Chrysler did not violate either the express or implied warranties as noted above, since a defect has not been sufficiently established by the Plaintiff.

Chrysler correctly contends that Count X & XI should be stricken because they are based on title 6, sections 2711 and 2719(2) of the Delaware Code, which provide for no cause of action, but rather describes remedies available to the Plaintiffs.

Chrysler argues that it is entitled to judgment on Plaintiffs' Lemon Law Claim (Count XII). Under Delaware's Lemon Law, Title 6, Chapter 50, four attempts for the same problem are required to create a presumption that the consumer can recover. Further, the consumer cannot benefit from such a presumption unless the manufacturer has received "prior direct written notice." [FN16] In the present case, although Plaintiffs allege that the vehicle was brought in for repair four times for the same defect, the first time was on the day of purchase for an air leak and the last three times were for water leaks. Defendants argue that the water and air leaks are separate issues. However, despite this factual dispute, Plaintiffs never sent the required notice, until after the Jeep was voluntarily repossessed.

> FN16. See Del.Code Ann. tit 6 § 5004(b).

Plaintiffs also argue that under the Lemon Law, the issue before the Court is whether there's been reasonable opportunity to repair. [FN17] The Bouchard court held that the principal question is whether the automobile continually malfunctions. The court stated, "[i]t matters not that Defendants now claim that the vehicle has been fixed and is in superior condition." [FN18] However, in the instant case, Defendants are not claiming that the Jeep has been fixed. They are stating that it has not been fixed subsequent to Plaintiffs' ownership, that there have been no reported leakage problems, and the evidence suggests that the problem could likely be an improper fastening of the removable top.

> FN17. Bouchard v. Savoca, D/B/A R-S Motor Sales, 493 N.Y.S.2d 417 (N.Y.Sup.Ct.1985).

> FN18. Id. at 418. See, also, Muzzy v. Chevrolet Division, General Motors Corp., 571 A.2d 609 (Vt.1989), Pecor v. General Motors Corp., 150 Vt. 23, 547 A.2d 1364 (1988).

Chrysler also argues that there is no evidence to support Plaintiff's claim of consumer fraud (Count XIII). The Consumer Fraud Act, title 6, section 2513 of the Delaware Code, makes it unlawful for any person to engage in any "deception, fraud, false pretense or concealment, suppression or omission, in connection with the sale or advertisement of any merchandise ..." Plaintiffs have shown no evidence that Chrysler had any knowledge of any problems prior to selling the Jeep.

*5 Finally, Chrysler argues that the evidence does not support Plaintiff's Deceptive Trade Practices Claim (Count XIV). There is no evidence that Chrysler engaged in any deception in this case, let alone a pattern of deception, as would be required to create a cause of action. [FN19] Plaintiff concedes that this count is "probably not within the mainstream of the law." [FN20]

> FN19. Wald v. Wilmington Trust Co., 552 A.2d 853 (Del Super.Ct.1988).

> FN20. Transcript of November 12, 2002, Summary Judgment Motions at 7.

### Defendant Baker's Arguments

Baker also alleges that it made no express warranty to the Plaintiff. Alternatively, Baker points out that Delaware law permits an express warranty to be disclaimed by the seller of a product. [FN21] In this case, the sales contract stated the Jeep was being sold "as is." Thus, Baker argues that there are no facts to support an express warranty claim against Baker. Baker also argues that it is entitled to judgment as to Plaintiff's claim for breach of implied warranty of merchantability. In order to establish a breach of implied warranty of merchantability under section 2-316 Plaintiffs must initially establish that the Jeep was 1) sold by a merchant, 2) the Jeep was not merchantable at the time of sale, 3) the Plaintiffs suffered an injury, 4) proximately caused by a defect, and 5) Plaintiffs provided notice to seller of injury.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2003 WL 21481012 (Del.Super.)
**(Cite as: 2003 WL 21481012 (Del.Super.))**

Page 5

[FN22] Baker does not agree that the Jeep was defective, however, even if a defect were present, Baker was not put on notice of the problem and thus was given no opportunity to cure.

> FN21. Del.Code Ann. tit 6 § 2316.

> FN22. *Reybold Group, Inc. v. Chemprobe Technologies, Inc., 721 A . 2d 1267, 1270 (Del.Supr.1998)*.

Baker argues that Counts VI, IX and XI should be dismissed or stricken as they do not state a cause of action. As discussed above, the code sections relied upon are merely remedies available to Plaintiffs in the event they establish a cause of action under a section in the U.C.C. Additionally, Counts VI and IX allege a defect which has not been established in the instant case.

Baker asserts that it is entitled to judgment on Plaintiffs claims for breach of contract, Counts VII and VIII, because Plaintiffs made an election of remedies to rescind the contract and in any event there was no breach.

Baker argues that the Lemon law claim, Count XII, should be dismissed as it relates to Baker because the law provides a remedy for purchasers of defective vehicles against the manufacturer, not the automobile dealership.

Baker again agrees with Chrysler in stating that Baker is also entitled to summary judgment on plaintiffs' claims of consumer fraud, Count XIII, and deceptive trade practices, Count XIV.

*Defendant CFC's Arguments*

CFC asserts that any alleged liability on its part is premised on the Federal Trade Commission's Holder in Due Course Rule. This Rule allows a plaintiff to pursue a claim against CFC for up to the amount of any payment made by the plaintiff to CFC. CFC will be deemed liable under the same circumstances as the seller of the vehicle; in this case Baker. CFC realleges and incorporates all the above arguments for summary judgment.

*Conclusion*

Underlying all of Plaintiffs' claims against all of the Defendants is the premise that the Jeep was defective in some material way. As the alleged defect has not been established through the circumstantial evidence presented by Plaintiffs, and no expert has been provided, there is no basis for any of the claims. Thus, as a matter of law, Plaintiffs can not prove a defect.

**\*6** For the aforementioned reasons, Defendants' Motions for Summary Judgment are GRANTED.

IT IS SO ORDERED.

2003 WL 21481012 (Del.Super.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF SERVICE

I, Karen L. Pascale, hereby certify that on May 17, 2005, I caused to be electronically filed a true and correct copy of the notice of the foregoing ***Appendix of Unreported Cases Cited in Symbol Technologies, Inc.'s Opening Brief in Support of Its Motion for Judgment on the Pleadings Pursuant to Rule 12(c)*** with the Clerk of Court using CM/ECF which will send notification of such filing to the following counsel of record:

> Jack B. Blumenfeld, Esquire
> MORRIS NICHOLS ARSHT & TUNNELL
> 1201 N. Market Street
> Wilmington, DE 19801
> [jblumenfeld@mnat.com]

I further certify that on May 17, 2005, I caused a copy of the foregoing document to be served by hand delivery on the above-listed counsel, and that a copy was served on the following non-registered participants on the same date in the manner indicated:

> ***By FedEx***
>
> Frederick A. Lorig, Esquire
> Bruce R. Zisser, Esquire
> BRIGHT & LORIG, P.C.
> 633 West Fifth Street
> Suite 3330
> Los Angeles, CA 90071
>
> Carson Veach, Esquire
> Leland W. Hutchinson, Jr., Esquire
> Jennifer Fitzgerald, Esquire
> FREEBORN & PETERS LLP
> 311 South Wacker Drive
> Suite 3000
> Chicago, IL 60606
>
>
> _____/s/ Karen L. Pascale_____
> BOUCHARD MARGULES & FRIEDLANDER, P.A.
> Andre G. Bouchard (#2504) [abouchard@bmf-law.com]
> Karen L. Pascale (#2903) [kpascale@bmf-law.com]
> 222 Delaware Avenue, Suite 1400
> Wilmington, DE 19801
> (302) 573-3500
> *Attorneys for Plaintiff, Symbol Technologies, Inc.*