DOCUMENT NO. 18

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

SYMBOL TECHNOLOGIES, INC., )
a Delaware corporation, )
                        )
            Plaintiff, )
                        )
     v. )
                        )
INTERMEC TECHNOLOGIES CORP., )
a Washington corporation, )
                        )
            Defendant. )
                        )

**REDACTED VERSION FOR PUBLIC INSPECTION**

Civil Action No. 05-146-GMS

*CONFIDENTIAL –
FILED UNDER SEAL*

## SYMBOL TECHNOLOGIES, INC.'S REPLY BRIEF
## IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE PLEADINGS
## PURSUANT TO RULE 12(c)

BOUCHARD MARGULES & FRIEDLANDER, P.A.
Andre G. Bouchard (I.D. No. 2504)
  [abouchard@bmf-law.com]
Karen L. Pascale (I.D. No. 2903)
  [kpascale@bmf-law.com]
222 Delaware Avenue, Suite 1400
Wilmington, Delaware 19801
(302) 573-3500

*Attorneys for Plaintiff,
Symbol Technologies, Inc.*

OF COUNSEL:

Eric J. Lobenfeld
Ira J. Schaefer
HOGAN & HARTSON L.L.P.
875 Third Avenue
New York, New York 10022
(212) 918-3000

June 8, 2005

**Table of Contents**

INTRODUCTION ........................................................................................................... 1

ARGUMENT:   AS A MATTER OF LAW, SYMBOL PROPERLY
TERMINATED THE AGREEMENT AND IS NOT
LIABLE  FOR BREACH OF CONTRACT DAMAGES ................... 8

    A.   Symbol Properly Terminated the Agreement After
Intermec Refused to Discontinue the Delaware RFID
Action Against Symbol ......................................................................... 8

        1.   Intermec Technologies Corp. Does Not Dispute
That It Is Responsible for the Acts of Intermec IP
for Purposes of the Delaware RFID Action and
the Agreement ......................................................................... 8

        2.   Allowing Intermec to Evade the Consequences of
Maintaining the Delaware RFID Action Against
Symbol Would Deprive Symbol of the Benefit of
Its Bargain ............................................................................. 9

        3.   It Is Undisputed that the Delaware RFID Action Is
a Suit Against Symbol ........................................................... 10

    B.   Intermec Repudiated the Agreement by Instituting the
Intermec Patent Action ....................................................................... 11

    C.   Intermec Cannot Claim Breach of Contract Damages as a
Matter of Law ....................................................................................... 12

CONCLUSION ........................................................................................................... 13

# Table of Authorities

Cases

*DeMarie v. Neff,*
  No. Civ. A. 2077-S, 2005 WL 89403 (Del. Ch. Jan. 12, 2005)...................................12

*Kronenberg v. Katz,*
  872 A.2d 568 (Del. Ch. 2004)......................................................................................12

*PAMI-LEMB I Inc. v. EMB-NHC, L.L.C.,*
  857 A.2d 998 (Del. Ch. 2004)......................................................................................11

*Sonitrol Holding Co. v. Marceau Investissements,*
  607 A.2d 1177 (Del. 1992) ............................................................................................9


Statutes

8 Del. C. § 261 ...............................................................................................................11

Fed. R. Civ. P. 12(c) ........................................................................................................2

Fed. R. Civ. P. 25(c) ......................................................................................................11

## INTRODUCTION

The facts pertinent to Plaintiff-Counterclaim Defendant Symbol Technologies, Inc.'s ("Symbol") Motion for Judgment on the Pleadings seeking to dismiss, with prejudice, the counterclaims of Defendant Intermec Technologies Corp. ("Intermec") are simple and undisputed. The issues for the Court on this motion are strictly ones of law; namely, what are the legal consequences of the parties' conduct.

Intermec's Answering Brief in Opposition to Symbol's Motion for Judgment on the Pleadings (the "Opposition") is noteworthy more for what it admits than for what it disputes. Intermec concedes that the OEM Agreement (the "Agreement") provides that if either party "asserts a bona fide claim of patent infringement" against the other, the non-asserting party has the unequivocal right to terminate the Agreement. (D.I. 16 at 6.) Although not explicitly stated in the Agreement, the reason for such a provision is self-evident. No one should have to do business with a party that is conducting patent litigation against it.

Further, there undoubtedly is a suit pending in this Court in which Intermec is asserting patent infringement claims against Symbol. Intermec cannot dispute that _Intermec v. Symbol_ (C.A. 04-357-GMS) (the "Delaware RFID Action") is, in fact, a patent infringement claim by Intermec against Symbol.

So what is Intermec's defense? First, Intermec plays "bait and switch," arguing that the plaintiff in the Delaware RFID Action is not "Intermec Technologies Corp.," the signatory to the Agreement, but its wholly-owned and controlled subsidiary "Intermec IP Corp." (D.I. 16 at 7, 11.) But that will not help Intermec. The record is clear and unequivocal that Intermec Technologies ("Technologies") treats itself and Intermec IP ("IP") as one and the same entity. Technologies controls IP, controls the patents-in-suit

in the Delaware RFID Action and licenses those patents to third parties. IP is a shell, whose only assets appear to be the patents Technologies has decided to transfer to it.[1]

In fact, Technologies is suing Symbol for infringement of patents that are <u>owned by IP</u>![2] Intermec's press release announcing the suit in this Court pending before Chief Judge Robinson (C.A. 05-147-SLR) (the "Symbol Patent Action"), begins as follows: "Intermec Technologies Corp. ... filed suit ... charging Symbol Technologies ... with infringement of Intermec intellectual property ...." (Ex. A.) To repeat, some of those patents being asserted by Technologies are owned by <u>IP</u>, not by Technologies. So, according to Intermec, "Technologies" and "IP" are somehow separate when it suits Intermec, but are one and the same when it does not. Indeed, in the case between the parties pending in Wisconsin (C.A. 05-C-0256-C) (the "Wisconsin Action"), Intermec's brief in support of its motion to transfer to this District specifically states that there are four cases pending "between plaintiff Symbol Technologies, Inc. and defendant Intermec." The "Intermec" defendant in the Wisconsin Action is Technologies, not IP, and one of those four cases is the Delaware RFID Action in which IP, and not Technologies, is plaintiff. Intermec itself thus makes no distinction between Technologies and IP, even with respect to the litigation between the parties.

Moreover, the patents that are technically "owned" by IP are actually licensed to third parties by Technologies, the public announcements about the licensing is made by Technologies, and the participation in standards organizations concerning RFID is

---

[1]    Because Intermec's Opposition relies on emails and other extrinsic evidence, Symbol will do likewise. If the Court determines to convert this motion to one for Summary Judgment (*see* Fed. R. Civ. P. 12(c)), Symbol has no objection, since Intermec has obviously chosen to treat it as such. The inclusion of such extrinsic evidence does not create disputed material facts, and the Court can still decide Symbol's motion as a matter of law. (*See* D.I. 14 at 8.)

[2]    They are U.S. Letters Patent Nos. 5,598,487 and 6,621,942.

2

engaged in by employees of Technologies.  *See, e.g.,*

# REDACTED

In short, this is not a case in which a parent maintains a wholly-owned subsidiary as a separate operating business and Symbol is somehow trying to "pierce the veil." Indeed, Intermec does not even make a pass in its brief at explaining that Technologies is not responsible for the acts of IP, including the decision to assert the patents "owned" by IP against Symbol.

---

[3]     *See also* Ex. D, Intermec press release stating that "Intermec Technologies Corp. today announced a limited-time Rapid Start Licensing Program" for RFID patents, including those "owned" by IP.

Finally on this point, permitting Intermec to evade the consequences of its conduct on this non-existent distinction between Technologies and IP would eviscerate Symbol's rights under the Agreement, and deprive it of the benefit of its bargain. That is because Symbol owns all of its patents in its own name, while Technologies has chosen to transfer ownership of some of its patents to its wholly-owned subsidiary IP. Thus, based on Intermec's argument, Symbol could never invoke the termination right under Paragraphs 9.c or 18.k of the Agreement, because any patent claim Intermec brought against Symbol could be brought, at Intermec's option, in the name of IP, thereby enabling Intermec to flout the "no assertion of patent claims" terms of the Agreement. The Court should reject such sleight of hand.

The other half of Intermec's factual position is equally baseless and is sheer sophistry. To be clear, Symbol agrees that Intermec initially sued Matrics which was then an independent entity. After Symbol acquired Matrics, and merged it into Symbol, Matrics ceased to exist. At that point, Symbol informed Intermec of this and pointed out that Paragraph 9.c of the Agreement permits Symbol to terminate it if Intermec "asserts a bona fide claim of patent infringement" against Symbol. (D.I. 9, Ex. A.) Symbol acknowledged that it was not improper for Intermec to assert such a claim, for the period prior to Matrics' merger into Symbol. (*Id.*) But at the point of the merger and thereafter – when Matrics ceased to exist – Symbol asked Intermec to confirm that it was not seeking damages for Symbol's sales. (*Id.*) Not only did Intermec not confirm, but it specifically told Symbol that it would not discontinue the Delaware RFID Action, even as to sales by Symbol. (*See* D.I. 9, Ex. B.) Intermec even withdrew its objection to Symbol being substituted as the party defendant in the Delaware RFID Action. (D.I. 9, ¶ 66.) So,

4

there is no doubt that, as of October 29, 2004, when the Matrics merger became effective (the "Effective Date"), Intermec was, in fact, asserting a "bona fide claim of patent infringement" against Symbol; Symbol gave Intermec notice of that fact, and months to act appropriately if Intermec wished not to risk termination of the Agreement. But Intermec continued to assert patent infringement against Symbol, as it does today.

To address another of Intermec's points, Symbol gave Intermec notice of termination on March 10, 2005, and commenced the Symbol Patent Action that same day. (*See* D.I. 9, Ex. C.) Intermec complains that, because Symbol filed the Symbol Patent Action before the expiration of a thirty-day "waiting period" provided for in the Agreement (*i.e.*, prior to April 9), Symbol breached the Agreement. (D.I. 5, ¶¶ 43-44.) Significantly, Intermec does not even assert that it was harmed by this alleged breach, or that Symbol's "jumping the gun" (if that is what it did) somehow affected Intermec. In fact, the only harm Intermec could conceivably allege would be to assert that it intended to withdraw the Delaware RFID Action against Symbol – that is, no longer "assert a bona fide claim of patent infringement" – within the thirty-day window had Symbol only waited, and that Intermec was deprived of that opportunity. But even Intermec cannot make such a patently frivolous claim. Far from intending to withdraw the Delaware RFID Action, Intermec itself filed patent infringement claims against Symbol (the "Intermec Patent Action"), in breach of Paragraph 18.k of the Agreement, on the 13th day following Symbol's notice and filing of suit. Intermec thereby repudiated its own performance under the Agreement and ratified Symbol's termination thereof. Symbol's "breach" was, therefore, immaterial, and caused absolutely no harm to Intermec.

Intermec's conduct in repudiating the Agreement and ratifying Symbol's termination is both unsurprising and completely consistent with Intermec's public statements that Symbol's notice of termination caused no injury whatsoever to Intermec's business. The day after Symbol gave notice, Intermec issued a press release stating that Symbol's decision to terminate the Agreement "will have no impact on Intermec's ability to supply laser scan products," quoting Intermec's President, Tom Miller ("Miller"), as stating: "[Intermec] assure[s] Intermec customers, partners and the industry that Intermec is well-positioned to supply all scanning products, including lasers, indefinitely." (*See* Ex. E.) (emphasis added). Of course, it was the Symbol lasers that are the subject of the Agreement. Intermec's public response to the termination was a big "who cares."

Intermec's confidence that termination of its laser engine supply from Symbol would have no adverse impact whatsoever on Intermec's business (and hence no contract "injury" from Symbol's alleged breach), was repeated and elaborated in its press release dated March 24, 2005, the day after Intermec asserted the Intermec Patent Action against Symbol in this Court, prior to the expiration of thirty days from Symbol's notice of termination.

Intermec's press release states, *inter alia*:

> On March 10, Symbol abruptly breached a supply contract with Intermec for laser scan engines. "Intermec had been anticipating this for some time," Miller said. "Symbol's decision will have no effect on Intermec business operations."

> Intermec has multiple levels of protection against disruption, the company said: a substantial and long-term supply of Symbol scan engine inventory, additional outside sources of laser scan engines based on technology licensed by Symbol, and a full range of imagers not impacted by Symbol's recent actions. In addition, later this year

6

> Intermec will introduce into the U.S. its own non-infringing
> EXCELerate™ laser scan engine, the next-generation of
> laser scanning technology.

(*See* Ex. A.) (emphasis added).

Intermec's position was perhaps best summed up in a document distributed to the

industry entitled "A Personal Letter to Intermec Customers and Partners From Intermec

Chief Operating Officer Steve Winter." (Ex. F.)  With respect to Symbol's termination

of the Agreement, Intermec told the world:

> Intermec anticipated this response from Symbol and has
> been prepared for this action for more than six years. . . .
> To protect our customers and to ensure we would be able to
> meet market demand for our laser scan products, we have
> been forced to maintain unusually high inventories of
> Symbol scan engines. Our inventory on hand today will
> allow us to supply our customers' requirements
> indefinitely.

(*See id.*) (emphasis added and in original).

As they say in sports, "no harm, no foul."

Finally, we would be remiss if we did not respond at least a little bit to Intermec's

whining about the number of cases pending between the parties, as if Symbol is somehow

responsible for fomenting litigation. Nonsense. Intermec is, undoubtedly the "800 pound

gorilla" when it comes to RFID patents, and it touts that fact repeatedly. (*See* Ex. C.)

Intermec started the "war" by suing Matrics, a tiny company with almost no sales. When

Intermec told Symbol it would press that case against Symbol for sales by Symbol of

Symbol products, Symbol responded in the most appropriate way.  There are now suits

by Intermec against Symbol on 10 Intermec patents, and suits by Symbol against

Intermec on 6 Symbol patents.  There is no need for Intermec to complain to this Court.

Both parties are "big boys."

## ARGUMENT

### AS A MATTER OF LAW, SYMBOL PROPERLY TERMINATED THE AGREEMENT AND IS NOT LIABLE FOR BREACH OF CONTRACT DAMAGES

A.    **Symbol Properly Terminated the Agreement After Intermec Refused to Discontinue the Delaware RFID Action Against Symbol**

      1.    Intermec Technologies Corp. Does Not Dispute That It Is Responsible for the Acts of Intermec IP for Purposes of the Delaware RFID Action and the Agreement

Intermec cannot avoid the consequences of its decision to maintain a patent action against Symbol, thereby allowing Symbol to terminate the Agreement, by pretending that Technologies and IP are somehow functionally distinct. Intermec does not contend that IP is anything other than a shell entity entirely controlled by Technologies. Intermec has consistently represented – in its court papers, public announcements, participation in standards organizations, correspondence and press releases – that Technologies is responsible for the acts of IP. Nowhere in its Opposition does Intermec provide any factual or legal basis for this Court to treat these entities as distinct.

Furthermore, it is indisputable that Technologies controls the patents-in-suit in the Delaware RFID Action, including licenses to those patents. IP merely holds the patents, and then, only because Technologies (or its parent) decided to transfer some of its patents to IP. Technologies' dominion over IP is underscored by the fact that Technologies is suing Symbol in the Symbol Patent Action for infringement of patents that are technically owned by IP. Since Intermec does not distinguish between Technologies and IP for these purposes, this Court should likewise decline to do so.

2.      Allowing Intermec to Evade the Consequences of Maintaining
        the Delaware RFID Action Against Symbol Would Deprive
        Symbol of the Benefit of Its Bargain

Delaware recognizes the importance of affording parties the benefit of their

bargain.  When interpreting a contract, a court should give effect to each and every term

of an agreement and avoid interpretations that render contract provisions illusory or

meaningless since any other approach would deprive the parties of the bargained-for four

corners of their deal. *See Sonitrol Holding Co. v. Marceau Investissements,* 607 A.2d

1177, 1183 (Del. 1992). A party certainly cannot circumvent the clear intentions of the

parties, as evidenced by the plain language of a contract, merely to serve that party's

litigation strategy. *Id.* at 1182-83 (rejecting party's interpretation of contractual provision

which was a "futile attempt to frustrate the meaning, purpose and intent of the parties'

agreement" in order to bolster party's litigation position).

Here, Intermec's attempt to have this Court distinguish between Technologies and

IP so that Intermec can avoid the consequences of its maintenance of the Delaware RFID

Action is wholly at odds with Intermec's consistently treating Technologies and IP as

indistinct for these purposes, and would eviscerate Symbol's bargained-for rights under

the Agreement.  Paragraphs 9.c and 18.k clearly state that if Intermec or Symbol

institutes a patent claim or action against the other party, then such other party may

terminate the Agreement.[4]   According to Intermec, its subsidiary, distinct from

Technologies in name only, can maintain patent claims against Symbol without ever

triggering Symbol's right to terminate the Agreement under Paragraphs 9.c and 18.k.

---

[4]      In the case of Paragraph 18.k, a party may terminate the Agreement where the other party
breaches the Agreement by asserting a claim for either (i) "bar code readers to the extent that they
use CCD sensor technology," or (ii) "RFID Reader Products and RFID Tags except to the extent
that they read bar codes." (*See* D.I. 5, ¶ 24.)

Intermec Technologies could simply continue its practice of transferring its patents to IP and prevent Symbol from _ever_ exercising its termination option under the Agreement. Clearly, under the plain language of the Agreement, the parties did not intend nor agree to create unilateral termination rights, and Delaware law prohibits such a result. Technologies and IP are indistinct for the purposes of the Agreement and this litigation, as Intermec has repeatedly and publicly represented, and Intermec should not be permitted to avoid its contractual obligations simply by fabricating distinctions where none exist in order to gain tactical advantage.

3.    It Is Undisputed that the Delaware RFID
Action Is a Suit Against Symbol

Intermec admits that the Delaware RFID Action is a patent infringement action against Symbol. (D.I. 16 at 11.) Therefore, Symbol's termination of the Agreement was proper. It is undisputed that Paragraph 9.c of the Agreement explicitly provides that a party may terminate the Agreement if the other party asserts a patent claim against such party. Symbol notified Intermec on December 16, 2004 that, pursuant to Paragraph 9.c, Symbol would be entitled to terminate the Agreement unless Intermec discontinued the Delaware RFID Action against Symbol. (D.I. 9, Ex. A.) On December 20, 2004, Intermec categorically refused to discontinue the Delaware RFID Action. (D.I. 9, Ex. B.) On March 10, 2005, Symbol gave formal notice to Intermec that Intermec must discontinue the Delaware RFID Action with respect to sales of allegedly infringing products after the Effective Date, or Symbol would exercise its right to terminate the Agreement in accordance with Paragraph 9.c thereof. (D.I. 9, Ex. C.) Following

10

Intermec's continued refusal to discontinue the Delaware RFID Action against Symbol, which remains pending, Symbol terminated the Agreement.[5]

**B.      Intermec Repudiated the Agreement by Instituting the Intermec Patent Action**

"A repudiation of a contract is an outright refusal by a party to perform a contract or its conditions. A statement of intent not to perform unless terms different from the original contract are met constitutes a repudiation." *PAMI-LEMB I Inc. v. EMB-NHC, L.L.C.*, 857 A.2d 998, 1014 (Del. Ch. 2004). Once a party has repudiated a contract, the other party is relieved of any duty to perform under that contract. *Id.* at 1014-15 (internal citations omitted).

Intermec repudiated the Agreement by (i) refusing to discontinue the Delaware RFID Action against Symbol, and (ii) instituting the Intermec Patent Action against Symbol. Intermec unequivocally notified Symbol on December 20, 2004, well before Symbol instituted the Symbol Patent Action, that Intermec "does not plan to discontinue any portion of [the Delaware RFID Action]" against Symbol. (D.I. 9, Ex. B.) It is undisputed that if Intermec maintains a "bona fide claim of patent infringement" against Symbol, that action allows Symbol to terminate the Agreement pursuant to Paragraph 9.c. Since it is undisputed that the Delaware RFID Action is a "bona fide claim of patent infringement" by Intermec against Symbol, Symbol had the right to invoke the

---

[5]      Intermec's citation to 8 Del. C. § 261 and Fed. R. Civ. P. 25(c) for the proposition that Intermec could have continued the Delaware RFID Action against Matrics after it ceased to exist is misleading. (*See* D.I. 16 at 7.) Intermec made the same argument to the Court in opposition to Symbol's motion to be substituted for Matrics in that action. Of course, Intermec <u>consented</u> to that substitution before the Court ruled on the motion. In any event, the statute and the rule apply only to sales of allegedly infringing products by Matrics before it was merged out of existence. Once Matrics ceased to exist, the products were made and sold by Symbol, and Intermec asserted infringement claims against Symbol with respect to these sales. That is dispositive.

termination provision of Paragraph 9.c, which it did following Intermec's refusal to discontinue the Delaware RFID Action.

Were the Agreement still in effect despite Symbol's termination, Intermec's institution of the Intermec Patent Action against Symbol undoubtedly constitutes a repudiation of the Agreement because it is a material breach under Paragraph 18.k and, thus, excuses Symbol's performance under the Agreement. *See DeMarie v. Neff*, No. Civ. A. 2077-S, 2005 WL 89403, \*4 (Del. Ch. Jan. 12, 2005) (unpublished opinion) (D.I. 13, Tab 3).

### C.    Intermec Cannot Claim Breach of Contract Damages as a Matter of Law

Intermec has not and cannot show that it suffered any injury resulting from Symbol's termination of the Agreement.   Therefore, even assuming *arguendo* that Symbol's termination was somehow a breach of the Agreement, Intermec cannot meet the basic requirements for a breach of contract claim. *Kronenberg v. Katz*, 872 A.2d 568 (Del. Ch. 2004) (breach of contract claim under Delaware law requires a showing of compensable injury).

Although Intermec admits that the Delaware RFID Action is a patent infringement action against Symbol, thereby providing a basis for Symbol to terminate the Agreement pursuant to Paragraph 9.c, Intermec argues that Symbol's termination should nevertheless be considered a breach because Symbol did not provide Intermec a thirty-day "waiting period" following Symbol's March 10, 2005 formal notice of termination before instituting the Symbol Patent Action. (*See* D.I. 16 at 12-14.) That argument is illogical. Symbol notified Intermec on December 16, 2004 that the Delaware RFID Action gave Symbol the right to terminate the Agreement. (D.I. 9, Ex. A.) By the

12

time Symbol instituted the Symbol Patent Action, on March 10, 2005, nearly three months had elapsed since Symbol's December 16, 2004 letter, yet Intermec had not discontinued the Delaware RFID Action and had expressly declined to do so. (D.I. 9, Ex. B.) Intermec itself instituted an otherwise-prohibited suit before thirty days expired from Symbol's notice of termination. Intermec cannot show – and does even pretend to show – that it was in any way disadvantaged by not having additional time to reconsider its position.

## CONCLUSION

For all the foregoing reasons and those set forth in its Opening Brief, Symbol respectfully requests entry of judgment dismissing Intermec's counterclaims with prejudice, and (i) declaring that Symbol had the right to terminate the Agreement; (ii) declaring that Symbol has not breached the Agreement by terminating Intermec's rights thereunder; (iii) declaring that Intermec has ratified Symbol's termination of the Agreement; and (iv) declaring that Intermec's institution of the Intermec Patent Action was a breach of the Agreement.

BOUCHARD MARGULES & FRIEDLANDER, P.A.

June 8, 2005

/s/ Karen L. Pascale
Andre G. Bouchard (I.D. No. 2504)
    [abouchard@bmf-law.com]
Karen L. Pascale (I.D. No. 2903)
    [kpascale@bmf-law.com]
222 Delaware Avenue, Suite 1400
Wilmington, Delaware 19801
(302) 573-3500

*Attorneys for Plaintiff,*
*Symbol Technologies, Inc.*

OF COUNSEL:

Eric J. Lobenfeld
Ira J. Schaefer
Shana J. Krupp
HOGAN & HARTSON L.L.P.
875 Third Avenue
New York, New York 10022
(212) 918-3000

# EXHIBIT A



### Intermec Files Patent Infringement Claims Against Symbol

EVERETT, Wash., March 24, 2005 – Intermec Technologies Corp., a pioneer in automated data capture technologies, on Wednesday filed suit in the U.S. District Court for the District of Delaware charging Symbol Technologies of Holtsville, New York, with infringement of Intermec intellectual property related to key Intermec wireless access, terminal and software technologies. Symbol products infringe six Intermec patents, according to the lawsuit.

"Symbol's unauthorized use of Intermec's patents is a clear violation of patent law and involves a substantial part of Symbol's automated data capture product line," said Intermec President Tom Miller.

The patents cover: a coherent, integrated wireless data capture system capable of distributing data over a network; portable, battery-powered data processing devices capable of running a multi-tasking operating system; and handheld portable data capture devices with graphical user interfaces (GUI), the ability to accept handwritten information and the ability to process that information. Intermec is seeking damages and a permanent injunction to prohibit further infringement of Intermec patents.

A Symbol decision earlier this month to breach the terms of a supply contract with Intermec and to assert unfounded patent infringement claims against Intermec "frees us to defend ourselves against Symbol's claims and to prosecute our own patent infringement claims against Symbol," Miller said. "We owe it to our customers, our shareholders and the industry to strongly fend off Symbol's attempt to collect royalties for public domain technology and to stop Symbol's unlawful use of our patented inventions."

On March 10, Symbol abruptly breached a supply contract with Intermec for laser scan engines. "Intermec had been anticipating this for some time," Miller said. "Symbol's decision will have no effect on Intermec business operations."

Intermec has multiple levels of protection against disruption, the company said: a substantial and long-term supply of Symbol scan engine inventory, additional outside sources of laser scan engines based on technology licensed by Symbol, and a full range of imagers not impacted by Symbol's recent actions. In addition, later this year Intermec will introduce into the U.S. its own non-infringing EXCELerate™ laser scan engine, the next-generation of laser scanning technology.

Simultaneous with its suit to enforce its wireless access, terminal and software patents against Symbol, Intermec filed responses to the earlier Symbol claims, denying that Symbol had the legal right to terminate the laser scan engine supply agreement and asserting that Symbol wrongfully terminated that agreement.

Patent disputes of this type are typically resolved in negotiations between manufacturers without involving end users. "That's what we expect to happen here," Miller said. "Intermec has no plan to sue end-users over RFID or other patented technologies it controls.

"Intermec looks forward to an open discussion of these issues in the courts and welcomes the opportunity to demonstrate and sustain Intermec's technology leadership in the ADC industry," he said. "Our determination to protect our ability to innovate reflects our commitment to the success of our customers and partners and the prosperity of our shareholders."

**About Intermec**
Intermec Technologies Corp., a UNOVA Inc. (NYSE:UNA) company, develops, manufactures

and integrates technologies that identify, track and manage supply chain assets. Core technologies include mobile computing systems, bar code printers, label media and Intellitag® RFID. The company's products and services are used by customers in many industries worldwide to improve the productivity, quality and responsiveness of business operations. For more information, visit www.intermec.com or call 800-347-2636. To learn more about UNOVA, visit  www.unova.com.

# EXHIBIT B

# [redacted]

# EXHIBIT C

# [redacted]

# EXHIBIT D



**Intermec Introduces RFID Rapid Start Licensing Program for Limited Period to Provide Industry Access to Comprehensive IP Portfolio**

- **Provides unlimited access to broad portfolio of more than 145 Intermec RFID inventions at attractive terms**
- **Spurs adoption of Generation 2 RFID technology and clarifies rapidly-developing RFID vendor marketplace**
- **Settles issues of past infringement and frees partners from risk of future infringement**
- **Offered June 1 through Aug. 31**

EVERETT, Wash., May 4, 2005 – To spur adoption of RFID (radio frequency identification), a powerful new supply chain technology, and to simplify licensing of its RFID intellectual property portfolio, RFID pioneer Intermec Technologies Corp. today announced a limited-time Rapid Start Licensing Program that provides RFID manufacturers access to Intermec's broad portfolio of RFID innovation at attractive rates. The program, which begins June 1, 2005, and concludes Aug. 31, 2005, will provide the marketplace with clear guidance about which vendors are licensed to use Intermec's RFID IP and will simplify complicated technology cross-licensing issues.

"Technology vendors are feeling the pressure to provide the market with the high-performance RFID products and services customers are demanding," said Mike Wills, Intermec RFID vice president and general manager. "Intermec's Rapid Start Licensing Program offers substantial benefits and minimizes cross-licensing negotiation delays so our partners can rapidly design and bring their products to market without concerns about IP infringement. It provides customers the assurance they are looking for about who is clearly licensed by Intermec as they move ahead with RFID in 2005."

According to terms of the program, Intermec's 145-plus RFID patents, including continuations, will be available in four portfolio families to licensees who execute Rapid Start Licensing Program agreements through Aug. 31. Pricing includes a nominal initial fee and royalty fees of 2.5 to 7.5 percent. The program offers lower royalties for licensees who cross-license their IP and rates more favorable than traditional automatic data collection industry licensing programs.

Companies must execute a licensing agreement to receive the Rapid Start Licensing Program's special rates and access to its benefits. After the program concludes, Intermec will offer for license only individual patents and those patents declared on a reasonable and non-discriminatory basis (RAND) as part of standards-setting activities, at less favorable rates and terms than those available in the Rapid Start Licensing Program.

"Gartner advises our user clients to factor royalties for Generation 2 RFID equipment and tags into their business cases even though they will not directly pay them," said Jeff Woods, research vice president for enterprise and supply chain research at Gartner. "Efforts to avoid the royalties have only served to distract users and delay experimentation with the technology. Every step that the vendors and standards community can take toward clarification and simplification of intellectual property issues around RFID will accelerate rollouts of this important technology."

"Intermec remains committed to helping introduce the full benefits of supply chain RFID," said Intermec President Tom Miller. "Our program addresses customers' desires for multiple suppliers of this technology. At the same time, we respect the years and resources invested in our intellectual property portfolio and will take the necessary steps to protect it from use by unlicensed technology vendors."

For more information about Intermec's Rapid Start Licensing Program, contact Intermec Director Chris Kelley, 425-267-2998, or visit www.intermec.com/90days.

**About Intermec**
Intermec Technologies Corp., a UNOVA Inc. (NYSE:UNA) company, develops, manufactures and integrates technologies that identify, track and manage supply chain assets. Core technologies include Intellitag® RFID, mobile computing systems, bar code printers and label media. The company's products and services are used by customers in many industries worldwide to improve the productivity, quality and responsiveness of business operations. For further information, please visit www.intermec.com, or call 800-347-2636. To learn more about UNOVA, visit www.unova.com.

# EXHIBIT E



### Intermec Rejects Symbol's Unfounded Claims

EVERETT, Wash., March 11, 2005 -- Intermec Technologies Corp. has learned that Symbol Technologies, of Holtsville, New York, has filed a lawsuit in Delaware alleging that Intermec has infringed Symbol patents in the area of wireless communications. Intermec strongly believes there is no basis for this lawsuit.

The suit is an apparent reaction to Intermec's RFID patent-infringement lawsuit against Matrics Inc., filed in June 2004. Symbol knowingly acquired the lawsuit in September 2004 when it purchased Matrics. Intermec has charged that Matrics willfully and deliberately made, used, sold and offered for sale in the United States RFID products known to infringe Intermec's RFID patents.

**RFID Background**
In a statement, Symbol accused Intermec of hindering market adoption of RFID. "Nothing could be further from the truth," said Intermec President Tom Miller.

Intermec has promoted and actively advanced RFID adoption and RFID standards-setting processes while respecting intellectual property rights:

- Intermec made five patents core to the practice of RFID available on a royalty-free basis to further adoption of the EPCglobal Inc Generation 2 standard.
- Intermec made 11 patents available on a reasonable and non-discriminatory basis to support adoption of the international RFID standard ISO 18000 6b.

Intermec is committed to providing industry access to its RFID patent estate. In fact, since the adoption of the Gen 2 standard in December 2004, Intermec has accelerated RFID licensing discussions with a large number of potential licensees, including Symbol.

"Intermec has gone to great lengths to negotiate an RFID licensing program with Symbol that is consistent with Symbol's historical practices with respect to laser scanning and wireless licensing programs," Miller said. "Symbol walked away from the negotiations in the apparent belief that it is entitled to customary terms and conditions for its intellectual property but that Intermec is not entitled to the same."

**OEM Agreement**
Symbol also said the company is terminating an OEM agreement under which Symbol supplies Intermec with laser scan engines. That decision will have no impact on Intermec's ability to supply laser scan products, Miller said. "I assure Intermec customers, partners and the industry that Intermec is well-positioned to supply all scanning products, including lasers, indefinitely," he said.

Intermec, the leader in the development and sale of linear and area imaging products, introduced a revolutionary, non-infringing bar code laser scanning technology that is more compact and reliable and offers longer product life than current bar code laser scan engines.

Symbol's breach of the OEM contract removes the covenant not to sue for patent infringement and allows Intermec to enforce its data collection and smart battery patents, areas in which Symbol has substantial patent infringement exposure.

"These types of disputes are not unusual in high-tech industries as new technologies are brought to market," Miller said. "Intermec looks forward to court involvement. It gives us the opportunity to

demonstrate and sustain our technology leadership."

**About Intermec**
Intermec Technologies Corp., a UNOVA Inc. (NYSE:UNA) company, develops, manufactures and integrates technologies that identify, track and manage supply chain assets. Core technologies include mobile computing systems, bar code printers, label media and Intellitag® RFID. The company's products and services are used by customers in many industries worldwide to improve the productivity, quality and responsiveness of business operations. For more information, visit www.intermec.com or call 800-347-2636. To learn more about UNOVA, visit www.unova.com.

# EXHIBIT F





Intermec
Technologies
Corporation

6001 36ᵗʰ Avenue West
Everett, Washington 98203
United States
tel   425.348.2600
fax  425.365.9551
www.intermec.com



### A Personal Letter to Intermec Customers and Partners
### From Intermec Chief Operating Officer Steve Winter

Intermec's commitment to the success of our customers and partners is a core Intermec value, and we take our responsibility to you seriously. Part of that responsibility is to provide you clear and honest information you can count on.

As you likely know, earlier this month Symbol Technologies cancelled a laser scan engine supply agreement with Intermec and filed a lawsuit alleging that Intermec is infringing Symbol wireless communication patents. These actions and allegations are completely unjustified and without merit. This is a dispute Intermec has tried hard, in good faith negotiations, to avoid.

It is important that you know the whole story. Intermec believes these actions by Symbol are an attempt to intimidate our company into accepting RFID licensing terms that would be detrimental to Intermec and to the industry.

As these issues proceed, our commitment to you is to provide you clear and accurate information. Included here is a summary of what's happened, Intermec's intellectual property policy, and a "fact and fiction" FAQ that addresses questions you may have.

Key points to understand:

- This is a fight Intermec tried hard to avoid. Unfortunately, Symbol chose very aggressive actions that strike at Intermec's core businesses. We have no choice but to defend ourselves.
- Intermec is well-positioned to provide an uninterrupted supply of scanners, including lasers, to our customers. We have a long-term supply in inventory, as well as the ability to purchase laser scan engines from other vendors.
- Later this year, Intermec will be delivering breakthrough MEMS-based laser scan technology that leapfrogs Symbol and other competitors. MEMS technology already has been field-proven and is faster and more reliable.
- Symbol's wireless lawsuit is without merit. Intermec has a strong non-infringement and invalidity position, as well as indemnification defenses from our radio suppliers.

- Intermec is a pioneer in wireless technology. Symbol has knowingly infringed Intermec patents for years. Because of Symbol's breach of its supply agreement, Intermec now is free to – and must – defend its own patents. Symbol has substantial infringement issues with our wireless, data collection, smart battery and RFID patents.

If you have questions about these actions at any time, please call me directly. I would be very happy to talk through these issues with you.

## Intermec Intellectual Property Policy

Intermec's intellectual property is straight-forward, easy to understand and designed to help propel market adoption in ways that protect companies' ability to continue inventing:

- Intermec has a long and strong history of innovation in technology areas such as bar codes, smart battery management, data capture, wireless technologies, mobile computing, RFID and more.
- Intellectual property is a natural by-product of innovation investment.
- Patent licensing is a normal and established method of making technology available. The current patent system has worked for decades to encourage companies to invest the time and resources it takes to develop and bring new technologies to market.
- Intermec has a long, demonstrable history of providing licensed royalty-free use of its intellectual property assets to encourage the practice and adoption of global standards. In the early days of bar code standards development, Intermec donated to the public domain patents covering some of the world's most widely used bar codes, including Code 29, Interleaved 2 of 5 and others. And to date, Intermec has donated more RFID intellectual property on a royalty-free basis than any other company in the ADC industry.
- Intermec strongly supports the efforts of EPC Global, ISO and other standards-setting bodies and will continue to lend support, know how and expertise to these organizations. We applaud the efforts of EPC Global to establish a Generation 2 standard and are proud of the fact that we patents that were critical to making this standard possible.
- Intermec proactively makes its RFID intellectual property available to the market by licensing access to manufacturers interested in building related RFID products as a way to encourage technology availability, competition and adoption.
- Intermec typically enforces its intellectual property rights at the manufacturer level and plans to do the same with respect to its RFID patents.

## Behind the News: The Real Story

Intermec believes Symbol's actions are a reaction to the RFID infringement lawsuit Intermec brought against RFID manufacturer Matrics Inc. in 2004.

After unsuccessful attempts to start a meaningful dialogue about its unauthorized use of Intermec's RFID intellectual property, Intermec filed suit against Matrics in June 2004, charging Matrics with infringement of four Intermec RFID patents. After Intermec filed its suit, Symbol announced it would acquire Matrics and subsequently merged Matrics into Symbol in October of 2004. The bottom line: Symbol knowingly purchased the Intermec lawsuit when it acquired Matrics.

In July 2004, immediately after announcing its plan to purchase Matrics, Symbol approached Intermec and asked to begin RFID licensing discussions. Intermec negotiated in good faith with Symbol for many months.

During negotiations, Intermec made every effort to reach agreement on an RFID licensing program consistent with Symbol's own laser scanning and wireless patent licensing practices. According to its own public statements, Symbol seeks to charge for others' use of its patented technology but refuses to pay for its use of Intermec's patented inventions. This unjustifiable position apparently caused Symbol to walk away from RFID licensing negotiations on March 10. Symbol then tried to intimidate Intermec into a royalty-free RFID license by breaching its laser scanner supply contract and filing a frivolous patent infringement case against Intermec.

This lawsuit over wireless patents clearly is an attempt to pressure Intermec into entering into an unfair RFID licensing agreement, one that would perpetuate the inequitable position Symbol has held over the ADC industry for years. That is not in the best interest of Intermec, our industry or customers.

### No effect on Intermec business operations

<u>Intermec anticipated this response from Symbol and has been preparing for this action for more than six years.</u> This isn't the first time Symbol has cancelled its laser supply contract with Intermec. Over the years, Symbol has cancelled the agreement as a negotiating ploy to achieve more favorable terms and prices. Because of Symbol's past actions and its inability to perform as a reliable supplier of scan engines to Intermec, Intermec knew it could not count on Symbol. To protect our customers and to ensure we would be able to meet market demand for our laser scan products, we have been forced to maintain unusually high inventories of Symbol scan engines. Our inventory on hand today will allow us to supply our customers' requirements indefinitely.

In addition, as a result of Symbol's decision to breach our supply contract, Intermec now is free from reliance on Symbol as a supplier. Intermec now is free to provide customers with our own superior new EXCELerate™ laser scanning technology. And because Symbol broke the agreement's covenant not to sue, Intermec now can address Symbol's unlicensed use of a broad range of Intermec intellectual property.

# FAQ

## *Separating fact from fiction*

**FACT: Cancellation of Symbol's laser scanning supply contract will have absolutely no effect on Intermec business operations.**

*This is absolutely no threat to Intermec's business, and Intermec is determined to do everything it can to ensure Symbol's actions have no impact on our customers.* Intermec actually anticipated this action from Symbol and has been preparing for this threat for more than six years. Intermec announced its own EXCELerate™ laser scan engine, free of Symbol's laser scanning IP, in December 2004. This laser scan engine, with equal or superior performance to Symbol's most popular engines, will be integrated into Intermec products in the second half of this year. Ultimately, the EXCELerate™ engine will replace all Symbol engines in our product line.

*We have multiple sources of supply.* In addition to our own revolutionary EXCELerate™ product, Intermec has access to laser scanning technology from other manufacturers and has the right to manufacture laser scan engines of current design under a previously granted license.

*Intermec has a very large multi-year stock of Symbol scan engines in inventory.* This inventory allows Intermec to smoothly transition to other, more advanced laser scanning technologies and ensures continued customer support.

*The majority of Intermec scanning products no longer use laser scanning technology to read bar codes.* Products incorporating 1D and 2D imagers represent the majority of our business and are the fastest growing scanning technologies in the industry. Intermec invented imaging technology, manufactures its own 1D and 2D imagers and has access to this technology from other suppliers, as well.

**FACT: Symbol is once again allowing its myopic self-interest to potentially harm our industry. It is spreading inaccurate information designed to cause uncertainty and confusion among ADC customers.**

*Symbol is clearly acting out of self interest.* For nearly two decades, Symbol has used its IP position to control access to laser scanning technology. Symbol has collected large royalties from all AIDC manufacturers for laser scanning-based products, been the sole provider of laser scanning technology at higher than appropriate margins, or excluded AIDC companies from certain markets to protect its position. It now is exerting its wireless patents against ADC and network companies, as well.

*Despite what Symbol says, Intermec has done more to support the development of RFID standards and the industry than any other manufacturer.*

- As early as 2002, Intermec announced it would license core RFID IP broadly to the industry to support adoption of EPCglobal standards.

- Later, in connection with EPCglobal standards-setting activities, Intermec offered licensed, royalty-free use of core patents that made development of the EPCglobal Generation 2 standard possible. In fact, without Intermec's generosity, there could have been no EPCglobal "royalty-free" Gen 2 air interface protocol standard.

- Unlike Symbol's proprietary approach to its laser scanning patents, Intermec has offered to license additional patents to manufacturers to ensure the widespread availability of RFID technology providers.

- The licensing rates established by Intermec for use of its patented technologies are below the rates Symbol demanded and received for its laser scan technology when that technology was first introduced to the market. Intermec RFID licensing rates also compare favorably with rates Symbol currently is collecting on its wireless communications patents.

*Intermec is committed to providing industry access to its RFID patent estate.* In fact, since the adoption of the Gen 2 standard in December 2004, Intermec has accelerated RFID licensing discussions with a large number of potential licensees and will continue to do so.

*We know of no manufacturer that is delaying commercialization of EPC Gen 2 product due to IP concerns.* In fact, in recent industry forums, all providers stated they would have Gen-2 product available in the 2nd or 3rd quarter. The only thing holding back release of these products is the normal design and development cycle to complete products once a standard is adopted. Symbol has even stated they are aggressively moving forward with the release of EPC Gen2 products designs.

**FACT: Intermec is not infringing Symbol patents.**

*Intermec has carefully reviewed the 4 wireless patents being asserted by Symbol and has concluded it has strong non-infringement and invalidity positions.*

*It is highly unlikely that Symbol will be able to get a permanent injunction.* The patents Symbol is asserting are claimed to read on the 802.11 standard. In connection with the IEEE standard-setting process for 802.11, Symbol promised to make IP related to the standard available to all manufacturers on a reasonable and non-discriminatory (RAND) basis. It already has licensed several manufacturers. There is no legal basis for an injunction in circumstances like these.

## QUESTIONS

**How will this affect our industry in the long term?**

*Symbol's action is unfortunate, and something Intermec tried hard to avoid.* As the head of one leading ADC company told us recently, Symbol's actions have caused harm to the industry and transformed what should have been private negotiations into a public spectacle. Symbol's actions could, in fact, slow down RFID adoption – which had been proceeding swiftly after ratification in December of the EPCglobal Generation 2 standard – by creating doubt and confusion in the marketplace.

We will do all in our power clear up the confusion that has been created by Symbol, reassure manufacturers of our intent to license and keep the industry moving forward.

*Judicial resolution of the IP disputes between Intermec and Symbol is probably a good thing. It will confirm Intermec's technology leadership.* Intermec has invested in many new technologies: RFID, linear and two-dimensional imaging, battery management, MEMS laser scanning, fuel cells and many other technologies. By bringing these exciting new technologies to market and <u>by offering open access through reasonable licenses to other manufacturers,</u> Intermec will make it possible for many in the industry and the end user community to benefit from its innovations.

**What's next?**

*Intermec's RFID patent suit against Matrics is in the discovery phase and is scheduled to go to trial in April 2006.*

Since Symbol has breached its OEM agreement, Intermec is now is free to enforce its substantial portfolio of non-RFID patents against Symbol infringement.

On March 23, Intermec sued Symbol for infringement of Intermec wireless patents. Symbol had knowingly been infringing Intermec patents for years. Its breach of the supply agreement allows us to attempt to stop this unlawful practice.

*Expect to be subjected to more misinformation.* You likely will hear a lot about the IP actions between the two companies. Some will attempt to spread rumors, misinformation and untruths. It can be hard to separate fact from fiction in these instances.

Know this. While these issues are being resolved, Intermec is determined to continue to keep our focus on our customers in industries around the world, to

work with partners worldwide to bring to market products and technology that help businesses run more efficiently and prosperously.

Intermec's first responsibility is to protect our customers and partners. If you have questions about Intermec or want to hear the plain truth from Intermec in person, please contact us. We will provide you with the plain truth you know you can expect from Intermec.

Thank you.

## CERTIFICATE OF SERVICE

I, Karen L. Pascale, hereby certify that on June 15, 2005, I caused to be electronically filed a true and correct copy of the foregoing document – *Symbol Technologies, Inc.'s Reply Brief in Support of Its Motion for Judgment on the Pleadings Pursuant to Rule 12(c)* **[REDACTED VERSION FOR PUBLIC INSPECTION]** – with attached exhibits with the Clerk of Court using CM/ECF which will send notification of such filing to the following counsel of record:

> Jack B. Blumenfeld, Esquire
> MORRIS NICHOLS ARSHT & TUNNELL
> 1201 N. Market Street
> Wilmington, DE 19801
> [jblumenfeld@mnat.com]

I further certify that on June 15, 2005, I caused a copy of the foregoing document to be served by hand delivery on the above-listed counsel, and that a copy was served on the following non-registered participants on the same date in the manner indicated:

### *By FedEx*

> Frederick A. Lorig, Esquire
> Bruce R. Zisser, Esquire
> BRIGHT & LORIG, P.C.
> 633 West Fifth Street, Suite 3330
> Los Angeles, CA 90071
>
> Carson Veach, Esquire
> Leland W. Hutchinson, Jr., Esquire
> Jennifer Fitzgerald, Esquire
> FREEBORN & PETERS LLP
> 311 South Wacker Drive, Suite 3000
> Chicago, IL 60606

> _____/s/ Karen L. Pascale_____
> BOUCHARD MARGULES & FRIEDLANDER, P.A.
> Andre G. Bouchard (#2504) [abouchard@bmf-law.com]
> Karen L. Pascale (#2903) [kpascale@bmf-law.com]
> 222 Delaware Avenue, Suite 1400
> Wilmington, DE 19801
> (302) 573-3500
>   *Attorneys for Plaintiff, Symbol Technologies, Inc.*